IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | ) CR. NO. 12-00133 JMS |
|---|---|
| Plaintiff, | ) ORDER DENYING DEFENDANT'S ) MOTION TO SUPPRESS |
| vs. | ) |
| LARRY LEE, | ) |
| Defendant. | ) |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

## I. INTRODUCTION

Defendant Larry Lee seeks an order from the court suppressing evidence seized from his van pursuant to a consent search on January 25, 2011. After reviewing the motion, the supporting and opposing memoranda, the arguments of counsel, and considering the testimony and credibility of the witnesses, the court finds that Defendant voluntarily consented to the search of his van and that the search was lawful under the automobile exception to the Fourth Amendment. As a result, Defendant's Motion to Suppress is DENIED.

///

///

///

## II. BACKGROUND

### A. The Government's Case

On December 27, 2010, various items, including a government-issued firearm, were stolen from Department of Homeland Security, Immigration and Customs Enforcement ("ICE") Special Agent Ivan Young's vehicle while parked at a Costco retail store located in Honolulu. A joint ICE and Honolulu Police Department ("HPD") Crime Reduction Unit ("CRU") investigation ensued.

On January 15, 2011, Young and members of the HPD interviewed Joshua Bagayas-Cabalar. Bagayas-Cabalar informed law enforcement that he and Kevin Agno stole the items from Special Agent Young's vehicle, and then sold them to Lee for $400 at the Ala Moana Beach Park on December 27, 2010. According to Bagayas-Cabalar, Agno had called Defendant and arranged the sale.

HPD CRU Corporal Anthony Chong, with five other CRU members, went to Defendant's Honolulu residence located at 1621 Ala Wai Boulevard on January 25, 2011 at approximately 4:00 p.m. The officers were dressed in tee shirts and shorts, with their firearms concealed. Chong testified that they knocked on the door without announcing that they were police. Defendant's son, Kainoa

2

Haas, answered.[1] Haas confirmed that Defendant lived in the apartment. Haas then walked to the back of the apartment and called out to Defendant, who then came to the door. According to Chong, no firearms were drawn during this period or at anytime during the January 25 encounter.

Chong then explained to Defendant that he had traffic warrants outstanding for his arrest, and that two people wished to speak with him. Within a short period of time, ICE agents Young and Jason Pa arrived.

Pa and Young, also dressed in street clothes and concealing their firearms, met Defendant outside his apartment door. Pa showed Defendant his law enforcement credentials, and stated that he had information that Defendant may be in possession of items stolen from a government-owned vehicle. Pa testified that he told Defendant that he wanted to ask his some questions, but told him that he was not under arrest[2] and that he was not required to answer any questions. Pa also asked for consent to search Defendant's apartment and pick-up truck, telling

---

[1] Chong testified that his normal practice is to identify himself as a police officer and show his badge, although he could not recall the specifics of how he introduced himself to Haas.

[2] Even though Pa told Defendant that he was not under arrest, Chong earlier had informed Defendant that he had warrants outstanding for his arrest (which, apparently, had not been relayed to Pa). In any event, the government has conceded that given Chong's declaration regarding outstanding arrest warrants, Defendant was "in custody" from the time of his initial encounter with Chong. Doc. No. 61. And because Defendant was not given his *Miranda* warnings, the government has also conceded that it will not use any of Defendant's statements in its case-in-chief.

Defendant that he could refuse consent. According to Pa, Defendant agreed to speak with him and consent to a search.

Defendant, Pa, and Young then went inside the apartment to Haas' bedroom.[3] With the bedroom door open and unobstructed, Pa explained the reason for the interview -- to determine if Defendant was in possession of stolen items that he had obtained from Agno. Again, Pa asked for consent to search the apartment and Defendant's pick-up truck, telling Defendant that he could refuse to consent. Although Defendant again consented, the search failed to uncover any of the items stolen from Young's vehicle. Pa described his tone throughout the January 25 encounter as conversational.

Pa then interviewed Defendant in the bedroom. Defendant confirmed that he knew Agno and identified Agno's photograph and phone number. He also stated that he had previously obtained an antique firearm from Agno and had purchased cell phones from Agno at the Ala Moana Beach Park after Christmas 2010.[4]

---

[3] The apartment was described throughout the hearing as extremely cluttered, but nonetheless organized. The clutter, apparently consisting of many Apple products, left no place to sit in the living room area.

[4] Apparently, Defendant would "jailbreak" Apple iPhones, a process that removes certain limitations imposed by Apple on the phone's operating system.

Chong then took Defendant outside to wait for an HPD transport vehicle.[5] Chong testified that as is often his practice, he did not place Defendant in handcuffs.[6] While outside, the apartment building's resident manager, Robert Sablan, motioned to speak with Chong. Sablan then told Chong (outside of Defendant's presence) that Defendant owned a white Volkswagen van that he used for storage and that it was located in the parking lot. Upon questioning, Defendant confirmed that he owned the van. Chong asked permission to search the van -- Defendant responded that Chong could search it, but added that he did not want to be responsible if anything was found in the van, and that if Chong found something, Agno might have placed it in the van. Defendant also explained that he did not have keys to the van, but the door could be opened through a window.

Chong relayed this conversation to Pa. Pa then met with Defendant, stating that he appreciated Defendant's cooperation and understood that he owned a Volkswagen van. Pa then requested consent to search the van, explaining to Defendant that he could refuse to consent. And again, Defendant consented to a search, adding that if anything is found in the van, Agno probably put it there.

---

[5] Although the exact timing is unclear, at some point after the interview Chong told Defendant that the word on the "street" was that Defendant possessed the stolen firearm, but that sometimes information can be exaggerated or crossed.

[6] Chong explained that because Defendant was non-violent and cooperative, he was waiting until the HPD transport vehicle arrived to place Defendant in handcuffs.

Inside the van (which was clean on the outside, but very cluttered inside), Chong located a majority of Young's stolen items, including his government-issued firearm.

According to both Chong and Pa, at no time prior to the search of the Volkswagen van on January 25, 2011 was Defendant: 1) given his *Miranda* warnings; 2) placed in handcuffs; or 3) told that law enforcement could obtain a search warrant if he refused consent to search his apartment, pick-up truck, or Volkswagen van.

The parties stipulated that Defendant has ten prior felony convictions, eight prior misdemeanor convictions, and a total of eighty prior arrests.

**B.     The Defense Case**

Defendant's son, Kainoa Haas, testified that Defendant was in the bathroom when the police knocked on the apartment door on January 25, 2011. He explained that upon opening the door, several men then rushed into the apartment, with one officer pointing a gun at Haas' face for "five seconds or so" until he put his hands in the air. He was then brought outside of the apartment, where he was joined by Defendant a few moments later. Haas then left the area, and came back several hours later to find that the apartment had been "trashed."

The resident manager, Sablan, testified that when HPD arrived on January 25, he shut his door because it was "just too much for me." He testified that an HPD officer came to his apartment door and asked if Defendant lived in the building, had any storage space in the building, and whether Defendant owned any vehicles. Sablan pointed to where Defendant lived and explained that he owned a truck and van. Sablan further testified that he had not come outside, that he was scared, and the police "seemed to know me."

## III.  ANALYSIS

**A.     Consent to Search the Volkswagen Van**

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One of those "well-delineated exceptions" is "a search that is conducted pursuant to consent." *Id.*; *see also United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) ("[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." (quoting *Bustamonte*, 412 U.S. at 222)).

A consent to search is valid if the consent was freely and voluntarily given and not the result of duress or coercion, express or implied. *Bustamonte*, 412 U.S. at 227; *see also United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000) (stating that the consent must be "voluntary and intelligent"). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Bustamonte*, 412 U.S. at 227; *see also Cormier*, 220 F.3d at 1112.

Several non-exclusive factors, commonly called the *Jones*' factors, may assist the court in determining whether a person has voluntarily consented to the search, including:

> (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained.

*United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). "No one factor is determinative in the equation [and] these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Id.* at 502 (citing *Bustamonte*, 412 U.S. at 224 (rejecting "talismanic definition of 'voluntariness'

mechanically applicable" to all situations)). Indeed, although these factors "aid in the decision making process, the full richness of any encounter must be considered . . . . Every encounter has its own facts and its own dynamics. So does every consent." *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995), *overruled on other grounds by Georgia v. Randolph*, 547 U.S. 103 (2006).

In considering these factors, the court first turns to the credibility of the witnesses. As is obvious, Chong's testimony differs in several material respects from Haas' and Sablan's testimony. Most critically, Chong explained that the initial encounter with Haas and Defendant was low-key and consensual, without the police using force to enter the apartment in any way. In contrast, Haas testified that the police rushed into the apartment and pointed a firearm at his face for a short period of time. And Sablan testified that he spoke with Chong at his apartment door, and that is where Chong first learned that Defendant owned a Volkswagen van. Chong, however, testified that Sablan motioned to him while he was leaving the apartment area with Defendant, and only then told him about the Volkswagen van.

After carefully observing the demeanor of the witnesses and evaluating their candor and manner of testifying, the court finds that Chong was credible. His demeanor was earnest and straightforward, and he appeared at all

9

times to answer questions based on his truthful recall of events.  The same simply cannot be said of Haas and Sablan, both of whom appeared to the court to be testifying in a manner that they believed would be most beneficial to Defendant.  The court therefore does not credit either Haas' testimony concerning his initial contact with HPD or Sablan's testimony concerning his initial encounter with Chong.

Turning to the first three *Jones*' factors, it is without dispute that Defendant was in custody from the time of his initial encounter with Chong, and that he was never provided his *Miranda* rights.[7]  Based on Chong's and Pa's credible testimony,[8] the court also concludes no guns were drawn throughout the encounter and Defendant was not handcuffed until some time after he consented to search the Volkswagen van.

---

[7] Given the unique purpose of *Miranda* warnings, *United States v. Perez-Lopez*, 348 F.3d 839, 846 (9th Cir. 2003), questioned "the relevance of *Miranda* warnings to whether a consent to search was voluntary[.]"  That is, the court suggested that whether or not *Miranda* warnings were given provides no insight into the voluntariness of a consent.  And the Supreme Court may agree.  *See United States v. Patane*, 542 U.S. 630 (2004) (finding that the failure to provide *Miranda* warnings does not require suppression of physical evidence obtained from unwarned but voluntary statements).  Nonetheless, the failure to provide a *Miranda* warning remains as one factor to consider under binding Ninth Circuit law.

[8] The court recognizes that Pa and Chong were cross-examined regarding the lack of detail in several police reports.  The evidence, however, does not undermine the court's confidence that both Pa and Chong were credible throughout their testimony.

As to the fourth factor, Chong and Pa both discussed the consent issue with Defendant in a non-confrontational, conversational tone. Defendant provided consent twice to the search of the Volkswagen van -- once to Chong and once to Pa. And Pa specifically informed him, as he had done earlier, that Defendant could refuse consent. *See United States v. Mendenhall*, 446 U.S. 544, 559 (1980) ("[T]he fact that the officers themselves informed the respondent that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive."); *Patayan Soriano*, 361 F.3d at 504 (stating that "knowledge of the right to refuse consent is highly relevant in determining whether a consent is valid") (quotations omitted).

The weight of the last *Jones* factor (whether a defendant is told a search warrant could be obtained), "depends on the particular circumstances of the case and thus hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." *Cormier*, 220 F.3d at 1112. For example, threatening "a defendant with a search warrant intimates that the 'withholding of consent would ultimately be futile.'" *Id.* (quoting *United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994)). In other circumstances, "the failure to inform a defendant that a search warrant could be obtained constitute[s] a failure to apprise him of all his legal rights." *Id.* (discussing *United States v. Torres-Sanchez*, 83

11

F.3d 1123, 1130 (9th Cir. 1996)). In this case, there were no threats of any sort made to Defendant, and he was specifically informed that he could refuse consent. In any event, Defendant's substantial criminal history "increases the likelihood that [Defendant] was already aware" of his legal rights. *Cormier*, 220 F.3d at 1113.

Considering the totality of the circumstances, and concluding that Chong and Pa provided credible testimony, the court finds that Defendant's consent to search the Volkswagen van was intelligent and voluntary and Defendant's "will [had not] been . . . overborne and his capacity for self-determination critically impaired." *See Bustamonte*, 412 U.S. at 225. Before the search of the Volkswagen van, Chong and Pa both obtained Defendant's consent. In doing so, they were non-confrontational and maintained a conversational tone, while Defendant remained cooperative throughout. Defendant was specifically aware that he could refuse, but nonetheless twice consented to the search. In sum, the totality of the circumstances, including the *Jones'* factors, supports a finding that Defendant provided his consent intelligently and voluntarily and not as a result of duress or coercion, express or implied.

B.  **The Automobile Exception**

Another Fourth Amendment exception -- the "automobile exception" -- allows for a warrantless search of an automobile so long as "there is probable

12

cause to believe that the car contains articles that the officers are entitled to seize." *Chambers v. Maroney*, 399 U.S. 42, 48 (1970). *See also Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam) ("The Fourth Amendment generally requires police to secure a warrant before conducting a search. As we recognized nearly 75 years ago . . . , there is an exception to this requirement for searches of vehicles." (citations omitted.)); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

As explained in *United States v. Hatley*, 15 F.3d 856, 858 (9th Cir. 1994), there are two basic principles underlying the automobile exception: "First, automobiles are mobile and can be moved quickly outside the jurisdiction of the magistrate from whom the warrant must be sought. Second, the expectation of privacy in one's vehicle is reduced by the pervasive regulations governing vehicles capable of traveling upon public roads." (citations and internal quotation signals omitted.)

Probable cause exists to search a vehicle "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas v. United States*,

517 U.S. 690, 696 (1996). Probable cause is evaluated in light of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "The scope of a warrantless search based on probable cause is no narrower -- and no broader -- than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." *United States v. Ross*, 456 U.S. 798, 823 (1982).

Based on the totality of the circumstances, the court concludes that Pa and Chong had probable cause to search the Volkswagen van for items stolen from Young's vehicle. On January 15, 2011, Bagayas-Cabalar informed law enforcement that he and Agno stole the items from Young's vehicle, and then sold them to Defendant for $400 at the Ala Moana Beach Park on December 27, 2010. Ten days later, after knowing that he was accused of possessing the stolen items, Lee confirmed that he knew Agno and that he had purchased cells phones from Agno at the Ala Moana Beach Park after Christmas 2010. But most importantly, after Chong and Pa learned of the Volkswagen van and asked permission to search it, Defendant consented to the search but added that if anything was found in the van, Agno probably (or might have) placed it in the van. The evidence as a whole was certainly "sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas*, 517 U.S. at 696. At

a minimum, Defendant's statement regarding what may be found in the van, coupled with the information already known to Chong and Pa, provided probable cause to believe that some or all of Young's stolen items would be in the Volkswagen van. To demonstrate probable cause, the government need not *guarantee* that a search will yield evidence of a crime; instead, "probable cause" requires only that there be a *fair probability* that the search will yield such results. *See*, *e.g.*, *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) ("Probable cause exists when, under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a *fair probability* that a crime was committed." (citations and internal quotation signals omitted.) (emphasis added.)). A fair probability that a search would yield results was certainly present here.

Defendant suggests that the automobile exception does not apply because it was not clear to Chong that the Volkswagen van was operable at the time of the search. Specifically, Defendant stated that he did not have a key to the van, and it was cluttered inside (although in pristine condition on the outside with "shiny" tires). But there is nothing in the record to suggest that the Volkswagen van was immobile. For example, it had tires and was not on blocks. But because "the Fourth Amendment does not require that officers ascertain the actual

functional capacity of a vehicle in order to satisfy the exigency requirement" of the automobile exception, *Hatley*, 15 F.3d at 859, this argument fails.

## IV. CONCLUSION

The search of Defendant's Volkswagen van was constitutional under two separate exceptions to the warrant requirement -- consent and the automobile exception. As a result, Defendant's Motion to Suppress is DENIED.

DATED: Honolulu, Hawaii, June 6, 2012.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

United States v. Lee, Cr. No. 12-00133 JMS; Order Denying Defendant's Motion to Suppress